[No. F018137. Fifth Dist. Sept. 30, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL GORROSTIETA, Defendant and Appellant.

## COUNSEL

Robert Spertus, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Roger E. Venturi and Edgar A. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, J.**—After his motion to suppress evidence was denied, appellant Manuel Gorrostieta pleaded guilty to one count of transporting cocaine (Health & Saf. Code, § 11352, subd. (a)) and one count of possession, for sale, of heroin (Health & Saf. Code, § 11351). He also admitted various enhancement allegations, and was sentenced to a prison term of eight years, consisting of four years for the transporting of cocaine, a three-year enhancement for one prior drug conviction (Health & Saf. Code, § 11370.2, subd. (a)), and a one-year enhancement for having served a prior prison term (Pen. Code, § 667.5, subd. (b)). Sentencing on the possession for sale count and on other enhancements was stayed.

### FACTS

At approximately 5:30 p.m. on April 10, 1992, Officer Collier was the case officer in charge of executing a search warrant at 1117 Blossom Street in Bakersfield. Prior to execution of the warrant, Officer Collier had briefed the various officers to be involved in the operation. While he was at the Blossom Street location, Officer Collier received a call from a confidential reliable informant (hereafter CRI). On three prior occasions this informant

had provided officers in the department with information which led to the arrest and seizure of narcotics. The CRI informed Officer Collier that an Hispanic male named Manuel, who was about 30 years of age, 5 feet 6 inches tall, 150 pounds, with shoulder-length black hair and a small mustache, lived at 1031 Monterey Street, apartment B., operated a red Chevy mini pickup with chrome rims, and would be delivering narcotics to the Blossom Street residence that day, April 10th. He further related that Manuel made frequent deliveries of narcotics to the Blossom Street residence.[1]

During the course of executing the search warrant at the Blossom Street residence, the officers found over four grams of tar heroin and over three grams of cocaine hydrochloride in thirteen separate bindles. In Officer Collier's opinion, these drugs were possessed for sale.

About 10 minutes after they had secured the Blossom Street residence, Officer Collier related the information received from the CRI to the other officers at the scene and directed Officer Thomas to act as a lookout in an unmarked car in front of the house to alert them by radio in case Manuel arrived in the red pickup. Officer Thomas confirmed that after he had helped secure the Blossom Street residence, Officer Collier described an Hispanic male to him who might be driving a red or reddish orange pickup and who might be coming to the location with narcotics. Shortly thereafter, on a hand-held radio, Officer Thomas advised the other officers inside the residence that a red pickup with a man matching the description of Manuel had arrived.

Officer Randall Lara, a probation officer with the Kern County Probation Department, who was then assigned to the Probation Compliance Task Force, was a member of the search warrant execution team at the Blossom Street residence. Officer Collier had informed the team at the residence that a CRI had advised him that an individual named Manuel, whom he described, would be driving a red pickup and would be making a delivery of narcotics to the Blossom Street residence. Officer Lara was directed by Officer Collier to take an individual who matched the description given them by the CRI into custody when he approached the house. Shortly thereafter, Officer Thomas advised them by radio that a man driving a red mini pickup

---

[1]During his testimony at the suppression hearing, Officer Collier stated that the CRI told him that Manuel was going to deliver narcotics to the Blossom Street residence. An April 11, 1992, affidavit of Officer Collier, prepared in connection with the subsequent obtaining of a warrant to search two other residences, and admitted into evidence at the suppression hearing, indicated that the CRI told him only that Manuel made frequent deliveries of narcotics to this residence. On cross-examination at the suppression hearing, Officer Collier confirmed that he had earlier testified that the CRI told him that Manuel was going to deliver narcotics at the Blossom Street address but he acknowledged that in his police report he had stated only that the CRI told him that Manuel made frequent deliveries there.

and matching the description given them of Manuel had just pulled up in front of the residence. Upon receipt of this information, Officer Lara positioned himself at the door, opened it, and identified himself as a police officer. When the man, who matched the description given them by the CRI, stepped away from him, Officer Lara lunged at the man. They fell to the ground, and Officer Lara handcuffed him and took him into custody. Officer Lara explained that he took the man into custody because they were executing a search warrant for narcotics at the Blossom Street residence, and this individual met the description given them by the CRI of the person who would be delivering narcotics to the residence. He then patted Manuel down for weapons. In doing so, his attention was attracted to a bulge in the man's right front pocket. Based on the information given them by the CRI, Officer Lara believed the bulge to be cocaine and removed it from the man's pocket. The removed item was subsequently determined to be cocaine hydrochloride.

Following the seizure of appellant's person, the officers searched the mini pickup and allegedly found cocaine. Additional contraband was subsequently discovered in a dwelling allegedly occupied by appellant and his codefendant, Margaret Vigil. For the purposes of this appeal it is not necessary to discuss these additional matters. Appellant's motion to suppress focused entirely on his initial seizure by Officer Lara at the Blossom Street dwelling. It was stipulated by the parties that if that search was unlawful, then all subsequent searches would fail as well.

### APPELLANT'S CONTENTIONS ON APPEAL

Appellant raises two contentions on appeal. They are (1) the initial encounter between appellant and Officer Lara was not a detention but rather an arrest without probable cause, and the cocaine hydrochloride found on appellant was the product of that unlawful arrest, and (2) even if appellant was merely detained and not arrested when he was knocked to the ground and handcuffed, Officer Lara's subsequent removal of the cocaine hydrochloride from appellant's pocket was an act which exceeded the permissible scope of a patdown pursuant to *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. Respondent argues that appellant cannot now raise either of these contentions because appellant never raised them in the superior court.

*Arrest or Detention?*

Appellant contends that his initial encounter with Officer Lara was an arrest and not a detention. We agree. However, in light of our conclusion

the arrest was supported by probable cause, we need not address respondent's waiver argument that appellant cannot now argue that appellant was arrested, and not merely detained, because appellant did not raise this contention in the superior court.

Officer Lara's direct-examination testimony about his encounter with appellant at the door of the Blossom Street residence was as follows:

"Q. Now, while you were at the location, did you receive information from a fellow officer that the red pickup truck was arriving at the residence?

"A. Yes.

"Q. And who did you receive that information from?

"A. Officer Thomas.

"Q. And when you received that information, how did you receive the information?

"A. Via radio transmission.

"Q. And what did you do upon receiving that information from Officer Thomas?

"A. I then positioned myself at the front door to answer the front door once the individual arrived in the red pickup.

"Q. And did someone eventually approach the front door?

"A. Yes, they did.

"Q. And where did that individual come from?

"A. That individual came from the front of the yard which was belonging to the red pickup that was in the driveway.

"Q. And so you saw this person come out of the pickup truck and approach the front door?

"A. No. I just opened the door, confronted him and he matched the description given to us by the C.R.I. in the red pickup.

"Q. How much time elapsed between the time of Officer Thomas's radio transmission and this individual approaching the front door?

"A. Approximately probably 20 to 30 seconds, to the best of my knowledge.

"Q. And do you see that individual here in court today?

"MR. TORRES: Stipulate to identification for purposes of this hearing.

"THE COURT: Thank you. I will accept that.

"Ms. CACCIOTTI: For the record, it's—Mr. Torres represents Mr. Gorrostieta.

"THE COURT: Correct.

"Q. (By Ms. Cacciotti) And what, if anything, did you do upon opening the front door of the residence?

"A. I announced who I was and then I—the individual stepped away from me.

"Q. And what did you do when he stepped away?

"A. I then lunged at him and we rolled on the ground, took him into custody and handcuffed him.

"Q. Now, did you—after you handcuffed Mr. Gorrostieta, did you conduct a pat-down search of his person?

"A. Yes. I did so for officer safety. I did an exterior pat down of his person for weapons and for officer safety.

"Q. And after—or excuse me. During the course of the pat down, did you feel anything that attracted your attention?

"A. Yes, I did.

"Q. And what was that?

"A. It was a bulge in his right pants pocket, which to me seemed to be a plastic-feeling substance.

"MR. PUCKETT: Objection, your Honor; no foundation to that, nonresponsive.

"THE COURT: Sustained.

"Q. (By Ms. Cacciotti) When you felt the bulge in his pocket, what did you do?

"A. Based on the information given to us by the C.R.I. what this person was to deliver, I believed it to be the suspected cocaine hydrochloride.

"Q. And did you remove the item from the pocket?

"A. Yes, I did. After I placed my hand in his right front pocket, I then felt the same object I felt on the exterior and I pulled it out and it was cocaine hydrochloride."

During cross-examination by appellant's attorney, Officer Lara testified as follows:

"Q. Were you asked by Officer Collier to arrest this person that was approaching the house?

"A. We were told to take into custody an individual that matched that description when he approached the house.

"Q. This was by Officer Collier?

"A. Yes.

"Q. You said—it's your testimony that you were told to do this prior to your arresting him; is that correct?

"A. Well, we were advised that person was going to be arriving. That person arrived, we would take him into custody."

During cross-examination by the attorney for appellant's codefendant, Officer Lara testified as follows:

"Q. Okay. Now, is it my understanding of your testimony that when the defendant walked up to the house, you opened the door?

"A. Yes.

"Q. And he backed up?

"A. Yes.

"Q. And you immediately put your hands on him, got him on the ground and handcuffed him?

"A. Yes.

"Q. You arrested him at that time?

"A. Yeah. He was taken into custody.

"Q. Took him into custody there?

"A. Yes.

"Q. What did you take him into custody for?

"A. Why?

"Q. Yes.

"A. Because we were conducting a search warrant at 1117 Blossom which was—the warrant was served for narcotics and this individual met the information that was given to us by the C.R.I. who said this person was delivering narcotics, so we took him into custody pending investigation.

"Q. Who placed the handcuff's on him?

"A. I did.

"Q. Were you by yourself?

"A. No.

"Q. So the reason you put the handcuffs on him was because he showed up at a house [where] you were conducting a search warrant?

"A. Yes."

The Fourth Amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The protections afforded by the Fourth Amendment have been held to be applicable to the states through the due process clause of the Fourteenth Amendment. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) ■ In deciding the reasonableness of the search and seizure at issue here, we are bound by the lower court's findings of fact so long as they are supported by substantial evidence. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596 [174 Cal.Rptr. 867, 629 P.2d 961].) We determine independently, however, the legal issue of whether, on the facts found, the search was reasonable within the meaning of the Constitution. (*Id.* at p. 597.) ■ Because the facts of this case occurred after the passage of Proposition 8, "only that evidence which was illegally obtained under *federal* constitutional standards must now be suppressed in California courts."

(*People* v. *Gutierrez* (1984) 163 Cal.App.3d 332, 334 [209 Cal.Rptr. 376], italics original; see also *In re Lance W.* (1985) 37 Cal.3d 873, 885-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

 Appellant has essentially argued that this was not a detention, it was an arrest. Appellant concludes that there were grounds to detain, but not to arrest. He spends substantial time comparing this case to *Terry* v. *Ohio*, *supra.* In *Terry*, the Supreme Court of the United States held that a police officer could in some instances conduct a limited patdown search for weapons even though there was no probable cause to arrest.

"We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].) The *Terry* court also noted that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." (*Id.* at p. 22 [20 L.Ed.2d at p. 907].) Four years later, in *Adams* v. *Williams* (1972) 407 U.S. 143 [32 L.Ed.2d 612, 92 S.Ct. 1921], the court stated: "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (407 U. S. at pp. 145-146 [32 L.Ed.2d at pp. 616-617].)

These same principles were later reaffirmed in *United States* v. *Brignoni-Ponce* (1975) 422 U. S. 873, 880-881 [45 L.Ed.2d 607, 615-616, 95 S.Ct. 2574], and in the court's plurality opinion in *Florida* v. *Royer* (1983) 460 U. S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319]. In *Royer* the court stated: "Prior to *Terry* v. *Ohio*, *supra*, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless

justified by probable cause. [Citation.] *Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime. In that case, a stop and frisk for weapons were found unexceptionable. *Adams* v. *Williams*, 407 U.S. 143 [32 L.Ed.2d 612, 92 S.Ct. 1921] (1972), applied the same approach in the context of an informant's report that an unnamed individual in a nearby vehicle was carrying narcotics and a gun. Although not expressly authorized in *Terry*, *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 881-882 [45 L.Ed.2d 607, 616-617, 95 S.Ct. 2574] (1975), was unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. In *Brignoni-Ponce*, that purpose was to verify or dispel the suspicion that the immigration laws were being violated, a governmental interest that was sufficient to warrant temporary detention for limited questioning." (*Id.* at p. 498 [75 L.Ed.2d at p. 236].)

The court in *Royer* also stated: "The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. See, e.g., *United States* v. *Brignoni-Ponce, supra,* at 881-882 [45 L.Ed.2d at pp. 616-617]; *Adams* v. *Williams, supra,* at 146 [32 L.Ed.2d at p. 617]. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (460 U.S. at p. 500 [75 L.Ed.2d at p. 238].) In *Royer*, the court held that an extended detention of a suspected drug trafficker at an airport had exceeded the permissible bounds of a *Terry* investigative stop.

■ As has been noted, the principal difference between a *Terry* detention and an arrest is the distinction between "suspicion that [a person] may be connected with criminal activity" (*Terry* v. *Ohio, supra,* 392 U.S. at p. 10 [20 L.Ed.2d at p. 899]), and "probable cause to believe that the suspect has committed a crime. . . ." (*Ibid.*) ■ And what is probable cause? In *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], the court stated: " '[T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion.' . . .

While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " (*Id.* at p. 235 [76 L.Ed.2d at p. 546].)

In *People* v. *Price* (1991) 1 Cal.4th 324, 410 [3 Cal.Rptr.2d 106, 821 P.2d 610], our Supreme Court stated probable cause to arrest "exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime." ▮ At some point, a detention can become an arrest if not by actual express designation, then by effect. "When the detention exceeds the boundaries of a permissible investigative stop, the detention becomes a de facto arrest requiring probable cause." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 384 [269 Cal.Rptr. 447]; see, e.g., *Dunaway* v. *New York* (1979) 442 U.S. 200, 212 [60 L.Ed.2d 824, 835, 99 S.Ct. 2248].) ▮ Thus, what this case appears to be is akin to a de facto arrest. Therefore, we look to the record to see if an arrest, de facto or not, was justified.

What is the evidence here? The trial record demonstrates that a reliable confidential informant conveyed information to Officer Collier. It is unchallenged on appeal and unchallenged before the trial judge that the informant was reliable. The trial court found:

"I am prepared to make a decision. I am going to deny both of the motions to suppress. In doing so I'll make the following findings:

"As far as Mr. Torres's motion, I will make the factual finding that I do believe that Officer Lara had received the information from Collier prior to his search and seizure of Manuel Gorrostieta by—prior to the search and seizure of him.

"I base that on the fact that he testified he was aware of that circumstance. I also agree with Miss Cacciotti that the confusion from the preliminary hearing may be nothing more serious than a semantical argument dealing with what is a briefing. Be that as it may, I am satisfied that he was aware of that fact.

"Further, I do believe that justified the detention and the subsequent search was based on probable cause." What is the issue argued by the parties? Appellant's argument was ". . . his Fourth Amendment right against illegal searches and seizures were [*sic*] violated that precise moment that this officer, who did not have any knowledge that Officer Collier testified to, jumped out and lunged towards him and arrested him."

The prosecution's argument was specifically as follows:

"And what happened was they received this information after they got to the Blossom Street address from the C.R.I. and that Manuel showing up in the red pickup truck corroborated the C.R.I.'s information and allowed the officers to have probable cause to search the defendant, Mr. Gorrostieta.

"And further, his actions upon seeing Probation Officer Lara at the house, coupled with the C.R.I. information I think clearly allows for the detention and pat down of the defendant."

Therefore, the parties are arguing whether the information from the confidential reliable informant coupled with appellant's showing up at the residence is sufficient to arrest him or search him. The trial court ruled expressly that "the detention and the subsequent search was based on probable cause." Implicitly, the trial court responded to the contentions of the parties by concluding that there was probable cause to believe appellant had narcotics on his person. Necessarily, that probable cause was a result of the information given by the confidential reliable informant and appellant's showing up at the residence.

Herein lies part of the problem. Appellant's argument separates probable cause to arrest and probable cause to search under the circumstances in this case. There is no discernible distinction between probable cause to believe a person is carrying narcotics and probable cause to arrest for carrying narcotics as far as the consequence here is concerned. Neither requires certainty the person is in fact carrying narcotics to support either the search or an arrest. The only requirement is the probability of the specific criminal activity giving rise to the search or the arrest. In simple terms, if you have probable cause to believe a suspect has illegal narcotics in his pocket, you necessarily have an honest and strong suspicion the person searched is guilty of a crime.

In reality, once you search someone for contraband, based on probable cause etc., you have effectively "arrested" them for purposes of the Fourth Amendment. There are no magic words necessary. Normally, if the strong suspicion of illegal activity proves unfounded, the individual is released. The subject of arrest does not arise. That person was, however, for the brief period of the search, "arrested" in the eyes of the law. That is the nature of the term de facto—"in fact, indeed, actually." (Black's Law Dict. (4th ed. 1951) p. 479.) The trial court simply concluded that the information in the possession of Officer Collier was sufficient in conjunction with appellant's appearance at the house to show a probability of the crime of possession of narcotics. That is probable cause to search and it is probable cause to arrest.

We find the information here would amply have supported a search of appellant for narcotics, and accordingly an arrest. Thus, we conclude the narcotics seized were not the result of any violation of appellant's Fourth Amendment rights.

Since this is the issue upon which appellant predicates his appeal, and having concluded there is no merit in that contention, the judgment is affirmed.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.

A petition for a rehearing was denied October 25, 1993, and appellant's petition for review by the Supreme Court was denied December 15, 1993.