130 Cal.Rptr.2d 461 (2003)
105 Cal.App.4th 636
David VENEGAS et al., Plaintiffs and Appellants,
v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.
No. B148398.
Court of Appeal, Second District, Division Seven.
December 23, 2002.
Rehearing Denied January 15, 2003.
As Modified January 22, 2003.
Review Granted April 16, 2003.
*467 Robert Mann and Donald W. Cook, Los Angeles, for Plaintiffs and Appellants.
Franscell, Strickland, Roberts & Lawrence; and Cindy S. Lee for Defendants and Respondents County of Los Angeles, Michael Gray, Robert Harris and Thomas Jimenez.
Eduardo Olivo, City Attorney for the City of Vernon, and John J. Cardenas for Defendants and Respondents City of Vernon and Steven Wiles.
MUNOZ (AURELIO), J.[*]
In this case involving a trial on claims for false arrest under state law and for unreasonable search and seizure under the federal Civil Rights Act, 42 U.S.C. section 1983 (section 1983), plaintiffs appeal from judgment in favor of defendants after the court granted defendants' motion for nonsuit. Plaintiffs challenge the grant of the motion for nonsuit, related evidentiary rulings, as well as pretrial orders sustaining demurrers and granting summary adjudication on plaintiffs' other related claims.
In a criminal prosecution, where there is a search or seizure issue, the trial court determines the issue of probable cause as a matter of law. (See People v. Lawler (1973) 9 Cal.3d 156, 160, 107 Cal.Rptr. 13, 507 P.2d 621; People v. Gorg (1955) 45 Cal.2d 776, 780, 291 P.2d 469.) However, in a 1983 action the duty to resolve conflicts in the evidence is for the jury to determine so that the issue of probable cause essentially becomes a jury question. (McKenzie v. Lamb (9th Cir. 1984) 738 F.2d 1005, 1007-1008.) Here, the trial court, rather than the jury, attempted to resolve those issues. This was error and we reverse. We also conclude the trial court erroneously sustained demurrers to several related counts.[1]

*468 FACTUAL AND PROCEDURAL BACKGROUND

We set out here the evidence presented during plaintiffs' case in chief at the jury trial, which evidence was the basis for the grant of the motion for nonsuit.
The Task Force for Regional Auto Theft Prevention (TRAP) was an interagency task force run by the County of Los Angeles Sheriffs Department to facilitate multijurisdictional theft investigations. Defendant Steven Wiles (Wiles), a police officer for defendant City of Vernon, was assigned to the southeast TRAP team on June 24, 1998. About 7:00 p.m., Wiles, the investigating officer on the scene, was in a staging area in Bellflower with other TRAP members, preparing to execute a search warrant for a residence about a block away; the residence was that of Ricardo Venegas, the older brother of plaintiff David Venegas. Wiles had been informed that Ricardo Venegas was involved in switching vehicle identification numbers (VINs) on stolen cars and fraudulently getting titles at the Temecula DMV. Wiles had a photograph of Ricardo Venegas and a description of him as 5 feet, 11 inches tall, and weighing 210 pounds.
A white 1989 Mercury Cougar with no license plates drove past the staging area; the car was driven by a woman, later identified as plaintiff Beatriz Venegas (Beatriz); a male passenger in the car, later identified as Beatriz's husband, David Venegas (Venegas), appeared to some TRAP officers to look like Ricardo Venegas. TRAP officers followed the car until it stopped at a gas station about a block away from the staging area. According to Wiles, Los Angeles County Sheriffs Deputies Michael Gray (Gray) and Robert Harris (Harris) were the first officers to arrive at the gas station and contact David Venegas. Gray testified that a 1989 Cougar is in the class of high theft automobiles.
According to Venegas, Beatriz was inside the gas station paying for the gas while he (Venegas) was standing outside the car pumping gas; two cars pulled up and blocked the Cougar; about four men in casual clothes, but with badges around their necks, approached him and asked him who he was and whether he knew a Ricardo Venegas; he told them Ricardo was his brother; other officers approached Beatriz when she came out of the gas station building and detained her apart from Venegas. Venegas admitted that he had a verbal argument with Harris, and then Harris and Deputy Thomas Jimenez *469 (Jimenez) held him and handcuffed him.[2]
Wiles spoke with Venegas while other officers searched the Cougar for its VIN. In response to Wiles's questions about the Cougar, Venegas told him that he had just bought the car in Los Angeles; it was a salvaged vehicle; they had gone to the DMV, and were told that they had to go to the CHP to have a VIN issued. Officer Peloquin (Peloquin), from the Los Angeles Police Department, was Wiles's partner; Peloquin spent about 10 minutes looking for a public VIN on the Cougar and could find none; another officer was searching the glove box and under the seats of the car; Peloquin told Wiles that he had found a partial VIN on the car's engine. An officer gave Wiles documents found in the glove boxan odometer disclosure statement, a bill of sale, and a blank application for registration.[3] The bill of sale and odometer disclosure statement listed Beatriz Venegas as the buyer, Service Fajardo in Long Beach as the seller, and the date of sale as June 7, 1998. According to the officers there was no federal permit or temporary sticker on the car; according to Venegas, Harris took the temporary permit off the back window of the car and the Venegases never got that permit back.
In cross-examination, Venegas testified that when they bought the car, the federal sticker was in the back window of the car, but several days before this incident, they had the back window tinted, so they took the sticker off the back window and put it in the front windshield. Venegas had testified in a prior deposition that at the time of the incident, the sticker was in the front window of the car. Beatriz testified that a paper permit or registration was in the front windshield.
After the officers learned the car had no public VIN, they decided to impound the car to determine whether it was stolen. According to Peloquin, the partial VIN on the engine matched the VIN as stated on the odometer disclosure statement, but that was not conclusive evidence for him that the car was not stolen because the engine and transmission could have been replaced. Venegas admitted to Wiles that he (Venegas) knew the public VIN was missing on the Cougar; he told Wiles that the person who sold the car to the Venegases told them it was a salvaged vehicle. Wiles testified that at that point he did not know whether the paperwork found in the vehicle was fraudulent or pertained to the Venegas's vehicle.
Although Beatriz had produced a California driver's license, Venegas had no California driver's license or California identification card in his possession.[4] Venegas or Beatriz told the officers that Venegas had his identification at home, which was on Beach Avenue in Bellflower, about one and a half minutes away from the gas station. Wiles admitted that he knew within minutes that Venegas, who was only five feet, six inches tall, was not *470 Ricardo Venegas. Other officers at the scene told Wiles they believed Venegas was Ricardo Venegas. Wiles asked Venegas to sign an entry and search waiver form so that officers could go and pick up his identification; at first Venegas refused to give consent, but then he gave verbal consent for the officers to accompany Beatriz to their home to retrieve his identification. The Venegases were told that the officers would not search their home. According to Wiles it was necessary to go to the Venegas home to obtain Venegas's identification; according to Wiles, a positive identification "is to be made through like a valid license where we can run the name through dispatch and find out who he is." Wiles admitted, however, that neither he nor any of the other officers ran Venegas's name through the computer system, even though they admittedly could have done so and found out whether the person described in the system fit the description of the person they had in front of them.
Wiles was at the gas station for about 10 to 15 minutes before his immediate supervisor told him to leave to serve the search warrant; Venegas was placed, still handcuffed, in the back of Harris's van. Wiles admitted that while at the gas station, Beatriz was not free to leave.
According to El Segundo Police Officer Rudy Kerkhof (Kerkhof), also assigned to the TRAP team that day, someone told him that the Venegases had consented to a search of their home; although he could not recall, it was possible that he was the one who obtained Beatriz's signature on a written entry and search waiver form, which had been filled in by another officer and handed to him.[5] Kerkhof transported Beatriz to her home. According to Beatriz, the officers told her that she could not go into her home alone to retrieve her husband's identification; she signed the waiver form while she was in the police officer's car.
Beatriz retrieved Venegas's California identification card from their bedroom and brought it and Venegas's wallet out to the officer in the living room; the officer took Venegas's wallet from her and searched it. Two other police officers arrived at her home; Beatriz sat with Kerkhof on the couch in the living room while the other two officers searched their entire house; in the bedroom of their minor son Vincent, officers found a box where Venegas kept some papers indicating that Venegas was then on felony probation. While Venegas was sitting in the van with Harris, Harris got a radio call that the officers had verified his identification; Venegas admitted that he told Harris that he was on probation when they were sitting in the van.
About an hour after Wiles had left the gas station, he got a radio call from Harris informing him that they had gotten Venegas's identification and that Venegas was on felony probation for drug dealing. Wiles decided at that point that Venegas should be arrested for violation of Vehicle Code section 10751(a), a misdemeanor committed in his presence, and for violating his probation under Penal Code section 1203.2.[6] Venegas admitted at trial that he did not give verbal consent for a search of his home even though he knew that as a condition of probation, he was subject to *471 such a search with or without probable cause. Wiles admitted that he made the decision to arrest Venegas after he learned that Venegas was on probation.
According to Kerkhof, he had been in the Venegas home about 10 minutes when Harris arrived with Venegas. Harris brought Venegas into his home and sat him on the couch with Beatriz and Kerkhof; Beatriz was crying. For 30 minutes, Harris participated in the search of the home with two other officers; plaintiffs were never able to ascertain the identity of the two officers who searched their home. According to Venegas, the officers searched the home like they were looking for drugs. Beatriz admitted at trial that she was not claiming the officers damaged anything in their home; during the search, she did not question the officers or protest the search because she was scared.
Harris took Venegas to the Lakewood Sheriffs station, where he was booked into custody at 8:55 p.m. Beatriz was detained for about two hours, but was not charged with any VIN violation.
The next day, Gray partially dismantled the Cougar by removing six bolts and found a confidential full VIN on the car that matched the VIN as stated in the documents found in the glove box. On June 25, Wiles directed that Venegas be released from custody, but he was not released from custody until June 27, 1998. (See fn. 1, ante.) No charges were filed against Venegas arising out of the incident.
After plaintiffs rested their case in chief, defendants moved for a nonsuit.[7] After oral argument thereon, the court granted the motion. The court stated: "The situation was there was an ongoing investigation of Mr. Venegas's brother. His sister-in-law ... had been arrested the day before.[8] When Mr. Venegas was stopped there were no VINs on the car. [¶] I've seen the picture. He looks very, very similar to his brother, at least as far as I'm concerned. He was belligerent and noncooperative with the officers. He had no California driver's license or I.D. [¶] So under the circumstances I think there was more than enough probable cause. I thought the officers acted reasonably by any objective standard. So I'm going to grant the nonsuit at this time ...."
Plaintiffs appealed from the subsequent judgment entered in favor of defendants.

DISCUSSION

I

REVIEW OF JUDGMENT OF NONSUIT

A. Standard of Review of Judgment of Nonsuit in a Section 1983 Action.
"State courts exercise concurrent jurisdiction with federal courts in actions *472 based on the federal Civil Rights Act, but because the right being enforced is created by a federal statute, the state courts must apply federal substantive law." (Garcia v. Superior Court (1996) 42 Cal.App.4th 177, 181, 49 Cal.Rptr.2d 580.)[9] The primary purposes of section 1983 are "compensation and deterrence `for violations of federal rights committed by persons acting under color of state law.'" (Pitts v. County of Kern (1998) 17 Cal.4th 340, 348, 70 Cal.Rptr.2d 823, 949 P.2d 920.)
"States, and state officials sued in their official capacity, are not considered `persons' who can be sued, either in state or federal court, for damages under section 1983. [Citation.] Local governmental units such as counties or municipalities, on the other hand, are `persons' within the meaning of section 1983. [Citations.] A local governmental unit cannot be liable under this section for acts of its employees based solely on a respondeat superior theory. A local governmental unit is liable only if the alleged deprivation of rights `implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,' or when the injury is in `execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' (Monell, supra, 436 U.S. at pp. 690, 691, 694, [98 S.Ct. 2018])" (County of Los Angeles v. Superior Court (Peters) (1998) 68 Cal. App.4th 1166, 1171, 80 Cal.Rptr.2d 860.)
In reviewing an order granting a nonsuit, we accept plaintiffs' version of the facts, giving them the benefit of all legitimate inferences and disregarding conflicting evidence. (Lupash v. City of Seal Beach (1999) 75 Cal.App.4th 1428, 1433, 89 Cal.Rptr.2d 920.)
"Our task in determining whether probable cause to arrest existed as a matter of law in this § 1983 action is slightly different from a similar determination in the context of a direct review of a criminal arrest. In the latter situation, we are called upon to review both law and fact and to draw the line as to what is and is not reasonable behavior.... By contrast, in a § 1983 action the factual matters underlying the judgment or reasonableness generally mean that probable cause is a question for the jury." (McKenzie v. Lamb (9th Cir.1984) 738 F.2d 1005, 1007-1008.)
Qualified immunity shields officers from suits for damages under section 1983 if a reasonable officer could have believed the suspect's detention to be lawful, in light of clearly established law and the information the detaining officer possessed. (Hunter v. Bryant (1991) 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589, 595.) Regardless of whether it is the judge or jury who makes the ultimate determination on the issue of qualified immunity, that decision maker must rely on the jury's factual findings as to the disputed foundational or historical facts that underlie the determination. (Acosta v. City and County of San Francisco (9th Cir.1996) 83 F.3d 1143, 1147.)
We thus conclude that the motion for nonsuit should have been denied if the facts, whether or not disputed or conflicting, can be viewed favorably to appellants *473 to support a determination that respondents' conduct violated a federal right under the Fourth Amendment.

B. Detention and Arrest of Venegas; Detention of Beatriz; Search and Seizure of Vehicle.
Appellants contend essentially that their detentions were unlawful under federal law and were tantamount to arrests. David Venegas also contends his detention and arrest was unlawful under state law in that Vehicle Code section 10751(a) is a citeable misdemeanor, governed by Vehicle Code section 40302, so the officers should have either accepted his identification and cited him, or brought him before a magistrate.[10]
Although both detentions and arrests are seizures under the Fourth Amendment, the constitutional standard for permissible detentions is of lesser degree than that applicable to an arrest. (People v. Harris (1975) 15 Cal.3d 384, 389, 124 Cal.Rptr. 536, 540 P.2d 632.) Temporary detention of individuals during the stop of an automobile by police constitutes a detention under the Fourth Amendment. (Whren v. U.S. (1996) 517 U.S. 806, 809-810,116 S.Ct. 1769,135 L.Ed.2d 89.)
A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts which considered in light of the totality of the circumstances, provide an objective manifestation that the person detained may be involved in criminal activity. (People v. Souza (1994) 9 Cal.4th 224, 231, 36 Cal.Rptr.2d 569, 885 P.2d 982.) However, probable cause for arrests exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (People v. Limon (1993) 17 Cal.App.4th 524, 536, 21 Cal.Rptr.2d 397.)[11] Whether a Fourth Amendment violation has occurred depends *474 on an objective assessment of the officer's actions in light of the facts and circumstances confronting the officer at the time, and not on the officer's actual state of mind at the time the challenged action was taken. (People v. Miranda (1993) 17 Cal.App.4th 917, 923-924, 21 Cal. Rptr.2d 785.)
A traffic stop is justified at its inception if based on at least reasonable suspicion that the driver has violated the Vehicle Code or some other law. (People v. Bell (1996) 43 Cal.App.4th 754, 761, 51 Cal.Rptr.2d 115.) If the stop is based on reasonable suspicion that the driver has violated the Vehicle Code, then the detention is likewise permissible as to the passenger. (Ibid.) When an officer makes such a traffic stop, the stop may last only so long as is reasonably necessary to perform the duties incurred by virtue of the stop. (People v. Miranda, supra, 17 Cal. App.4th 917, 926, 21 Cal.Rptr.2d 785.) Thus, an officer may order the driver out of the car, ask for and examine the motorists driver's license and the car registration, discuss the violation and listen to any explanation, write a citation, and obtain the driver's promise to appear. (Id., at p. 927, 21 Cal.Rptr.2d 785.)
The purpose of questioning related to the purpose of the stop is to verify or dispel the suspicion that the law was being violated. (People v. Gorrostieta (1993) 19 Cal.App.4th 71, 82, 23 Cal. Rptr.2d 92, citing United States v. Brignoni-Ponce (1975) 422 U.S. 873, 881-882 [95 S.Ct. 2574, 2580-2581, 45 L.Ed.2d 607].) However, "[questioning during the routine traffic stop on a subject unrelated to the purpose of the stop is not itself a Fourth Amendment violation .... While the traffic detainee is under no obligation to answer unrelated questions, the Constitution does not prohibit law enforcement officers from asking." (People v. Brown (1998) 62 Cal.App.4th 493, 499, 72 Cal.Rptr.2d 793.)
If the person detained is unable to produce a driver's license, registration, or satisfactory proof of identity, then the officer may, depending on the circumstances, reasonably expand the scope of the stop, making it incrementally more intrusive. (People v. Miranda, supra, 17 Cal.App.4th 917, 927, 21 Cal.Rptr.2d 785.) Thus, "[c]ircumstances which develop during a detention may provide reasonable suspicion to prolong the detention. [Citation.] There is no set time limit for a permissible investigative stop; the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly." (People v. Russell (2000) 81 Cal.App.4th 96, 102, 96 Cal.Rptr.2d 568.) Thus, an officer can continue to detain a person during an investigatory stop when the officer's suspicions are heightened by the investigation. (Id., at p. 105, 96 Cal.Rptr.2d 568.)
"Limited warrantless searches for required registration and identification documentation are permissible when, following the failure of a traffic offender to provide such documentation to the citing officer upon demand, the officer conducts a search for those documents in an area where such documents reasonably may be expected to be found." (In re Arturo D. (2002) 27 Cal.4th 60, 86, 115 Cal.Rptr.2d 581, 38 P.3d 433.)
"There is `no bright-line for determining when an investigatory stop crosses the line and becomes an arrest,' [citation], and this determination `may in some instances create difficult line-drawing problems.' [Citation.] Furthermore, `there is no per se rule that detention in a patrol car constitutes an arrest.' [Citations.] However, `detention in a patrol car *475 exceeds permissible Terry limits absent some reasonable justification.'" (United States v. Torres-Sanchez (9th Cir.1996) 83 F.3d 1123, 1127.) In determining whether an arrest has occurred, all the surrounding circumstances must be considered, including the extent to which liberty of movement is curtailed and the type of force or authority employed. (Ibid.)
At the outset, we note that Beatriz and Venegas were already stopped and outside the Cougar when the officers arrived at the gas station, so no detention or search had yet occurred when the officers observed the car, without any license plates, and without any public VINs. (See People v. Ramirez (1996) 41 Cal.App.4th 1608, 1613, fn. 2, 49 Cal.Rptr.2d 311.) At that point, even if there had been a federal sticker on the windshield as claimed by appellants, reasonable suspicion existed that Beatriz had violated Vehicle Code section 10751(a) because the Cougar's public VIN had been removed. The officers' detention and questioning of both Beatriz and Venegas about the ownership and registration of the Cougar was proper under People v. Miranda, supra. Further, under In re Arturo D., supra, the search of the Cougar's glove box, and other areas where a public VIN was likely to be placed, was reasonable. Our record fails to provide any evidence that the officer's questioning or search of the Cougar went beyond that reasonably related to the reason for the stop and detention. Thus, at the point when Venegas admitted to Wiles his (Venegas's) ownership of the Cougar and that he was aware that the VINs were missing, Wiles had reasonable suspicion of, if not probable cause to arrest for, the violation. With respect to the issue of the seizure or impounding of the Cougar for the VIN violation, appellants' only argument is that "there was no reasonable basis for believing there was a VIN violation." The claim is without merit, as explained above.
Although the officers may have had reasonable suspicion of the section 10751(a) violation, our record contains sufficient facts warranting denial of the motion for nonsuit. The evidence presented a jury question as to whether the traffic stop detention was unreasonably prolonged for a two-hour period, which included a search of the Venegas home. On this record, the jury reasonably could have determined that the officers knew within minutes that Venegas was not his brother, that the information obtained by the officers at the gas station did nothing to implicate the Venegases in any offense other than the section 10751(a) violation, that the officers knew that they could have run the name "David Venegas" through their system to see if any results matched up with the individual they had before them, that it was unnecessary for the officers to detain Beatriz further and accompany her into the Venegas home, and that the two-hour detention, including the search of the Venegas home, was not reasonably designed to quickly resolve the issue of Venegas's identity. In other words, a reasonable jury could conclude that the detention and search were not reasonably necessary to perform the duties incurred by virtue of the stop (i.e., writing a citation for the Vehicle Code section 10751(a) violation or effecting a custodial arrest under Vehicle Code section 40302(a)). In fact, a jury could conclude that the information the officers obtained at the gas station actually dispelled, rather than verified, suspicions of any further criminal activity, including the suspicion that the Cougar was stolen.
Because Venegas admitted that he was hostile when approached by the officers, the officers' handcuffing of him may have been initially justified by the need of a "reasonably prudent" officer to protect *476 himself and others during the time that a traffic stop was permissible. (People v. Glaser (1995) 11 Cal.4th 354, 366, 45 Cal. Rptr.2d 425, 902 P.2d 729.) However, it is a question for the jury as to whether the continued detention and handcuffing of Venegas was reasonable.
Accordingly, whether the search of the Venegas home was with or without their consent, the Venegases were nevertheless detained during that search as a result of a traffic stop.[12] The evidence is sufficient to raise a jury question as to whether the detention of both appellants was unlawfully prolonged and intrusive and not properly within the scope of activities permitted by the traffic stop. A jury also could have found that Wiles, Gray, Harris and Jimenez were all involved in the detention: The involvement of Wiles and Harris is established by their own testimony; Gray admitted that he participated in the decision to detain Venegas; Venegas testified that Harris and Jimenez were the ones who held him and handcuffed him. The evidence is also sufficient to raise a jury question regarding at what point the conduct of the officers evolved from a stop into an arrest of Venegas and whether their conduct constituted an arrest of Beatriz. (See Choi v. Gaston (9th Cir.2000) 220 F.3d 1010, 1012.) Nonsuit was thus improperly granted as to all respondents on the claims for unlawful detention and/or arrest (i.e., unlawful seizure) asserted in counts one and four of the third amended complaint.

C. Warrantless Search of the Venegas Home.
Even if the detention of the Venegases was not unconstitutional, they claim their rights were also violated by the search of their home.[13]
A search conducted without a warrant is unreasonable per se under the Fourth Amendment unless it falls within one of the specifically established and well-delineated exceptions. (People v. Woods (1999) 21 Cal.4th 668, 674, 88 Cal.Rptr.2d 88, 981 P.2d 1019.) One of those exceptions is a search conducted pursuant to consent; a consent-based search is valid when consent is given by a person with common or superior authority over the area to be searched; consent of other interested parties is unnecessary. (Id., at pp. 674, 675, 88 Cal.Rptr.2d 88, 981 P.2d 1019.) Searches authorized by consent are limited by the scope of the consent. (People v. Bell, supra, 43 Cal.App.4th 754, 769, 51 Cal.Rptr.2d 115.) The voluntariness of a consent is a factual question to be decided in light of all the circumstances. (People *477 v. Aguilar (1996) 48 Cal.App.4th 632, 639, 55 Cal.Rptr.2d 716.) In United States v. Carbajal (9th Cir.1992) 956 F.2d 924, the court articulated a five-factor test for voluntariness that includes, among other factors, "(1) whether the person was in custody; (2) whether the arresting officers have their guns drawn; (3) whether Miranda warnings have been given; (4) whether the person was told she has a right not to consent; and (5) whether the person was told a search warrant could be obtained." (Id., at p. 930, fn. 3, 21 Cal. Rptr.2d 785.)
In this case, the facts were disputed as to the scope of the consent. Sufficient evidence was presented to permit a jury to infer that there was no voluntary and valid consent to search the home and that the Venegases consented only to have an officer accompany Beatriz into the home for her to retrieve her husband's identification. While Beatriz admitted signing the written entry and search waiver form, that is just one circumstance for the jury to consider in determining whether there was a valid consent to search. The jury could infer that Beatriz signed the waiver form reasonably believing she was only consenting to having an officer transport her to, and escort her into, her home for the purpose of retrieving her husband's identification. Wiles admitted that this was precisely what he had told the Venegases. Further, a jury could also conclude that Wiles knew that the Venegases had not consented to a search of their home, yet Wiles told Kerkhof that the Venegases had consented to such a search. In other words, it was Wiles who was responsible for the other officers searching the Venegas home, even though Wiles personally did not conduct the search. Accordingly, the nonsuit was improperly granted on the claims for unlawful search of the Venegas home.
Nor can the nonsuit be upheld on the theory that the search was lawful because of the existence of Venegas's probation condition. It is undisputed that respondents were unaware that Venegas was on probation until after they had initiated their search of the Venegas home. Respondents fail to cite any pertinent authority to establish that the legal principles which apply in a criminal prosecution, which principles may permit the admission of evidence obtained as a result of an otherwise illegal search involving a probationer subject to a search condition, would apply to a civil action for damages for unconstitutional police conduct.[14]
However, we need not decide here the issue of the legality of the search of an adult probationer or the probationer's residence by an officer who is not aware of his probation status. We also need not decide whether the same principles which apply in a criminal prosecution apply in a civil action for damages. Even if we resolve the foregoing issues favorably to respondents, the nonsuit was still improperly granted. "A waiver of Fourth Amendment rights as a condition of probation does not permit searches undertaken for harassment or searches for arbitrary or capricious *478 reasons." (People v. Bravo (1987) 43 Cal.3d 600, 610, 238 Cal.Rptr. 282, 738 P.2d 336.)
Sufficient evidence in this record creates a jury question as to whether the officers took advantage of Venegas's failure to possess his California identification card in order to search his home without probable cause and without reasonable suspicion of any criminal activity or evidence therein, but simply because he happened to be the brother of Ricardo Venegas, who was the subject of another investigation. Because the jury could have inferred arbitrary or capricious conduct on the part of the officers, triable issues existed as to whether the search was lawful pursuant to the probation condition. Nonsuit was thus also improperly granted on the unlawful search allegations in count one. Because many of the underlying facts will need to be determined by the jury, we find without merit Wiles's contention that the judgment in his favor can be affirmed on the ground that he is entitled to qualified immunity. (See, e.g., Conway v. Pasadena Humane Society (1996) 45 Cal.App.4th 163, 179, 52 Cal. Rptr.2d 777 [qualified immunity doctrine did not justify summary judgment in favor of officer because court could not conclude as matter of law that a reasonable officer would interpret city leash law as dispensing with Fourth Amendment warrant requirement].)
Because of the standard of review of the grant of nonsuit, and the substantive law governing section 1983 actions, we have necessarily disregarded any evidence impeaching the credibility of appellants or evidence of an officer's opinion of the law or subjective beliefs regarding the lawfulness of his conduct. We therefore need not address claims of evidentiary error at trial; any error in this regard is harmless and not prejudicial to appellants.[15]

II

RULINGS ON DEMURRER AND SUMMARY JUDGMENT

A. Count Eight.
Count Eight, premised on Civil Code section 52.1, subdivision (b), alleged an unlawful search and seizure in violation of federal and state constitutional rights.[16] In Boccato v. City of Hermosa Beach (1994) 29 Cal.App.4th 1797, 35 Cal.Rptr.2d 282, the court read former section 52.1 together with section 51.7, subdivision (a), and concluded that "an action brought under *479 Civil Code section 52.1 must allege that the plaintiff who claims interference with his or her rights also allege that this interference was due to his or her `race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute,' as set forth in section 51.7." (Id., at p. 1809, 35 Cal.Rptr.2d 282.)
In 2000, the Legislature amended subdivision (g) of section 52.1 expressly to state that an action brought under the section is independent of any other action, remedy, or procedure under any other provision of law, including but not limited to an action brought under section 51.7.
The Legislature also articulated its intent in enacting section 52.1. Section 1 of Chapter 98 of the Statutes of 2000, provides: "(a) The Legislature hereby finds and declares all of the following: [I] (1) Section 52.1 of the Civil Code guarantees the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state without regard to his or her membership in a protected class identified by its race, color, religion, or sex, among other things. [¶] (2) The decision in Boccato v. City of Hermosa Beach (1994) 29 Cal.App.4th 1797, 35 Cal.Rptr.2d 282 misconstrued Section 52.1 of the Civil Code to require that an individual who brings an action, or on whose behalf an action is brought, pursuant to that section, be a member of one of those specified protected classes. [¶] (b) It is the intent of the Legislature in enacting this act to clarify that an action brought pursuant to Section 52.1 of the Civil Code does not require the individual ... to be a member of a protected class identified by its race, color, religion, or sex, among other things." (See Historical and Statutory Notes, 6 West's Ann. Civ.Code (2002 supp.) foil. § 52.1, p. 134.)
The trial court apparently sustained demurrers without leave to amend as to count eight of the second amended complaint only on the basis of an interpretation of section 52.1 consistent with Boccato. Boccato is not binding on us. Our own independent interpretation of section 52.1(b) is contrary to that of Boccato. Without relying upon the recent pronouncement of legislative intent, we conclude that the clear and unambiguous language of the statute, as it read in 1998, did not require a plaintiff to be a member of a protected class. Accordingly, we conclude that appellants herein adequately pleaded claims under section 52.1. The trial court erred in sustaining respondents' demurrers to count eight.

B. Count 10 (Federal Civil Rights Claim based on Violation of Fifth Amendment Rights)
Count 10 in the third amended complaint alleged that respondents violated appellants' Fifth Amendment rights by their questioning of them at the gas station without giving them Miranda warnings. The trial court granted summary adjudication of this count in favor of Wiles and City of Vernon, stating that "plaintiffs aver nothing other than investigatory questions relating to the vehicle in question .... to the extent this was not a normal traffic stop, plaintiffs have their remedy elsewhere." The court relied upon similar grounds in sustaining a demurrer by the County defendants to this count.
The evidence in our record indicates that none of the officers' questioning at the gas station was unrelated to the suspected Vehicle Code section 10751(a) violation, or unrelated to questions about the ownership of the Cougar and the identity of the Venegases. It is undisputed that Wiles was at *480 the gas station for at the most about 15 minutes, and the alleged questioning in violation of Miranda occurred during this time period. Thus, there is no evidence, or reasonable inference therefrom, that the questioning unreasonably prolonged the detention. Appellants fail to cite any pertinent authority to establish that such proper questioning, in the context of an investigatory stop supported by reasonable suspicion, constitutes a Fifth Amendment violation under section 1983. Appellants thus fail to establish that any purported error in the trial court's sustaining of the demurrer or granting summary adjudication on count ten was prejudicial.

C. Federal Civil Rights Claims against Defendants Sheriff Lee Baca (Baca) and the Los Angeles County Sheriffs Department (Sheriffs Department).
Appellants seek reversal of the trial court ruling sustaining without leave to amend the demurrers of Sheriffs Department and Baca to the federal civil rights claims in the first amended complaint. Recognizing that states are immune from section 1983 liability under the Eleventh Amendment, appellants contend that the Sheriffs Department and Baca were acting as agents of the County, not the State.[17] Since Venegas has settled count five against County and its agents and employees for "overdetention" and false imprisonment arising out of his custodial detention after his arrest (see fn. 1, ante), any purported error with respect to this count would be moot and/or harmless. We therefore deem this contention to be directed only to count one of the complaint, dealing with the claims of unlawful search and seizurei.e., with the sheriffs crime investigative function.
Appellants urges us to follow Streit v. County of Los Angeles (9th Cir.2001) 236 F.3d 552, and to narrowly construe or reject County of Los Angeles v. Superior Court (Peters) (1998) 68 Cal.App.4th 1166, 80 Cal.Rptr.2d 860, which held that "in setting policies concerning release of persons from the Los Angeles County jail, the Los Angeles County Sheriff acts as a state officer performing state law enforcement duties, and not as a policymaker on behalf of the County of Los Angeles." (68 Cal. App.4th 1166, 1178, 80 Cal.Rptr.2d 860.) However, as Venegas has settled his claims for overdetention, we are not here concerned with the function of Baca and Sheriffs Department as administrators of the county jail, but with their function as investigators of crime. Therefore, neither Streit nor Peters are dispositive; those cases deal with the issue, and come to opposite conclusions, as to whether in managing the county jail, the sheriff acts on behalf of the county or the state.
Respondents fail to cite any pertinent authority to support their argument that the sheriff acts as a state official in carrying out crime investigations. The Ninth Circuit, however, has addressed the issue. "Two of our recent decisions demonstrate that California sheriffs act on behalf of the county in performing at least some of their law enforcement functions. See Bishop Paiute Tribe v. County of Inyo, 275 F.3d 893, 910 (9th Cir.), ...; Brewster v. County (9th Cir.2001) 275 F.3d 803, 807-808]. In Brewster, we held that California sheriffs are county actors when investigating crime in the county. 275 *481 F.3d at 807-08. More recently, in Bishop Paiute Tribe, we held that a sheriff is a county officer "when obtaining and executing a search warrant.' 275 F.3d at 910.[para;] In both Bishop Paiute Tribe and Brewster, we reasoned that sheriffs answer to the county for their conduct, even in their law enforcement capacities. Bishop Paiute Tribe, 275 F.3d at 907, 910; Brewster, 275 F.3d at 806. The county board of supervisors is charged with the responsibility of ensuring the sheriffs faithful performance of his duties. Brewster, 275 F.3d at 808 (citing Cal. Gov't Code § 25303 and Dibb v. County of San Diego, 8 Cal.4th 1200, 36 Cal.Rptr.2d 55, 884 P.2d 1003 ... (1994)). That the Attorney General has authority to supervise state law enforcement officers does not transform sheriffs into state actors because, taken to its logical extreme, this provision would immunize all law enforcement agencies in the State and `thereby render [ ] meaningless the decision in Monell, which preserves § 1983 actions against local governments.' Bishop Paiute Tribe, 275 F.3d at 908 (interpreting Cal. Const, art. V, § 13); Brewster, 275 F.3d at 808-09." (Cortez v. County of Los Angeles (9th Cir.2002) 294 F.3d 1186, 1191-1192.)[18]
In light of the foregoing, we conclude that the trial court erred in sustaining the demurrers of Sheriffs Department and Baca on the ground that as a matter of law they were acting as state actors and thus not liable under section 1983.

D. State Law Claims of Battery (Count 6) and Negligence (Count 9).
Only Venegas asserted battery, while all appellants asserted negligence, against County and City of Vernon. The ninth count alleged that the government entities were liable under state law for the negligent conduct of their employees and for the negligent hiring, training, and supervision of their employees.
Appellants challenge the trial court's ruling sustaining without leave to amend respondents' demurrers to these counts in the second amended complaint. The trial court ruled that these theories of liability were not reflected in Venegas's original July 1998 claims under the Government Tort Claims Act (Gov.Code, § 910 et seq.) and that his amended County claim filed in January 1999 was untimely and thus ineffective. The court found that Beatriz and Vincent "filed no claims," apparently based on the theory that the amended County claim filed in January 1999, which added Beatriz and Ira-Vincent as claimants, was untimely and thus tantamount to filing no claim at all with respect to County. With respect to City of Vernon, Beatriz and Vincent were not listed as claimants on David Venegas's July 1998 claim.
On appeal, City of Vernon and County seek to uphold the trial court's ruling as to David Venegas on the ground that the legal theories of battery and negligence varied from those included in his original claim. Venegas's original claim filed with County stated that the acts or omissions causing injuries were "False imprisonment, failure to timely bring before a judge, overdetention, failure to timely release Mr. Venegas, failure to properly select, train, supervise, and discipline employees." The January 1999 amended County claim stated the acts or omissions causing injuries were "False arrest and imprisonment; unlawful search and seizure of car and home; damage to car; failure to bring before a judge, over detention, failure to timely release Mr. Venegas, *482 failure to properly select, train, supervise, and discipline employees."
The claim filed with City of Vernon on behalf of David Venegas alleged the acts or omissions causing injuries to be "False arrest, unlawful search of car, unlawful search of home."
The purpose of the claim filing requirement of the Tort Claims Act is to provide a public entity with sufficient information to enable it to adequately investigate claims and to settle them, when appropriate, without the expense of litigation. (Wurts v. County of Fresno (1996) 44 Cal.App.4th 380, 386, 51 Cal.Rptr.2d 689.) A government entity may be sued for damages arising out the death or injury to a person only if a claim is first presented to the entity no later than six months after the accrual of the cause of action. (Gov.Code, §§ 911.2, 945.4.) Although compliance with the claims provisions is mandatory, sufficiency of the claim is tested by substantial rather than strict compliance. (Johnson v. San Diego Unified School Dist. (1990) 217 Cal.App.3d 692, 697, 266 Cal.Rptr. 187.) So long as the purposes of the claims statute are effectuated, its requirements should be given a liberal construction in order to permit full adjudication of the case on its merits. (Ibid.)
The general rule is that plaintiffs may not include causes of action in their complaints that have not been fairly reflected in the written claim submitted to public entities. (Stevenson v. San Francisco Housing Authority (1994) 24 Cal. App.4th 269, 276, 29 Cal.Rptr.2d 398.) A variance in pleading will not be found to be fatal where the basic facts were set out in the claim, where the plaintiff adds additional factual details or additional causes of action, and there was no "complete shift in allegations." (Id., at p. 277, 29 Cal.Rptr.2d 398.) In cases which have found a fatal variance between the claim and the complaint, the complaint attempted to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim. (Id., at p. 278, 29 Cal.Rptr.2d 398.)
The original claim filed with County alleged a false imprisonment; the claim filed with City of Vernon alleged a false arrest. False imprisonment and false arrest are not separate torts; rather, false arrest is but one way of committing a false imprisonment. (Collins v. City and County of San Francisco (1975) 50 Cal. App.3d 671, 673, 123 Cal.Rptr. 525.) In that the essence of battery is an intentional, harmful contact (Barouh v. Haberman (1994) 26 Cal.App.4th 40, 45, 31 Cal. Rptr.2d 259), it is difficult to imagine a police officer effecting a "false imprisonment" or "false arrest" without the use of force, i.e., an intentional contact. Further, the allegations in the negligence count are indeed reflected in the original County claim, which stated that the government entity failed properly to hire, supervise, and train its employees. With respect to the claim filed with City of Vernon, the negligence count merely adds different factual details without a complete shift in the nature of the underlying allegations of an unlawful arrest and search. We thus deem this case to fall within the Stevenson line of cases, in which the variance between the claim and the complaint is not fatal because the complaint merely amplifies on the details and legal theories reflected in the claim. As to David Venegas, the trial court erred in sustaining demurrers without leave to amend.
With respect to the assertion of count nine by Beatriz and Vincent against County, we conclude that the trial court erred in sustaining demurrer of County on the ground that their January 1999 claim *483 was untimely or ineffective. As pointed out by appellants in their reply brief, respondents waived the point by failing to provide written notice that their claims were not timely filed pursuant to Government Code section 911.3, subdivision (b). Subdivision (b) of Government Code section 911.3 provides: "Any defense as to the time limit for presenting a claim described in subdivision (a) is waived by failure to give the notice set forth in subdivision (a) within 45 days after the claim is presented, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant."
As to City of Vernon, there is no evidence in our record that Beatriz or Vincent filed any claims with City on their own behalf, so City's demurrer to count nine was properly sustained as to Beatriz and Vincent.

DISPOSITION
The judgment of nonsuit on counts one and four is reversed. On remand the trial court is also directed to vacate its orders sustaining respondents' demurrers to counts six (battery) and eight (violation of Civil Code section 52.1) and to enter new orders overruling the demurrers to counts six and eight; the trial court is further directed to vacate its order sustaining respondents' demurrers to count nine (negligence) asserted by David Venegas and to enter new orders overruling the demurrers to count nine as to David Venegas; the trial court is further directed to vacate its order sustaining the demurrers of Baca and Sheriffs Department to count one and to enter a new order overruling their demurrers to count one. The orders granting summary adjudication of count ten in favor of City of Vernon and Wiles, and sustaining without leave to amend County respondents' demurrer to count ten, are affirmed. The order sustaining without leave to amend City of Vernon's demurrer to count nine of Beatriz and Vincent Venegas is affirmed. Appellants are entitled to costs on appeal.
We concur: JOHNSON, Acting P.J., and PERLUSS, J.
NOTES
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] The operative facts pertaining to the pretrial orders will be set out with the discussion of those orders.

The third amended complaint contained ten "counts," which were labeled according to separate legal theories of liability. For ease of reference, we adopt plaintiffs' terminology without implying that each "count" necessarily represents only one separate and independent claim. For example, count one, labeled "Fourth Amendment/42 U.S.C. § 1983" alleges on behalf of all three plaintiffs a violation of the right to be free from an unreasonable search as well as a violation of the right to be free from an unreasonable seizure of the person. Plaintiff Vincent Venegas, the minor son of plaintiffs David and Beatriz Venegas, asserts only a claim for unconstitutional search; the other plaintiffs assert claims for both unconstitutional search and unconstitutional seizure (i.e., detention and/or arrest).
The only two "counts" which went to trial were count one pursuant to section 1983 for alleged unreasonable searches and seizures, and count four, asserted only by David Venegas, for false detention and arrest under state law. The only defendants/respondents involved on this appeal are County of Los Angeles (County), Michael Gray, Robert Harris, Thomas Jimenez, City of Vernon and Steven Wiles. County and County Sheriff's Deputies Michael Gray, Robert Harris, and Thomas Jimenez are sometimes referred to as County respondents. Although defendants Sheriff Lee Baca and the Los Angeles County Sheriff's Department have not made appearances as respondents on this appeal, County has raised arguments on their behalf in its respondents' brief.
Prior to trial, David Venegas settled with the County and its agents and employees, for $3,500 damages for count five which alleged false imprisonment and "overdetention, incarceration, and/or release." This count deals with David's being held in custody from June 25, 1998, through June 27, 1998. On June 27, David Venegas was released from custody without any charges being filed against him.
The events at issue on this appeal occurred on June 24, 1998, and involve the search of the Venegas home and the detention and/or arrest of David and Beatriz Venegas, from about 7:00 to 9:00 p.m.
[2] According to Wiles, it was Gray who handcuffed Venegas; Venegas was irate, using profanities, and questioning why he was not free to go. According to Wiles, Venegas was handcuffed for officer safety purposes. Gray admitted being at the gas station and participating in the decision to detain Venegas. Wiles did not see County Sheriff's Deputy Thomas Jimenez (Jimenez) at the gas station.
[3] According to the officers there was no salvage certificate in the glove box; according to Venegas, the salvage certificate was in the glove box and included in the documents retrieved by the officers.
[4] Beatriz had apparently produced for the officers Venegas's employee badge issued by Venegas's employer, Air Industries Corporation, which some officers felt did not positively identify Venegas as not being Ricardo Venegas. The only identifying information on the employee badge was Venegas's name, signature, and picture.
[5] The waiver form provided in pertinent part that Beatriz does "hereby grant full and unconditional authority to the Los Angeles County Sheriff's Department to enter those [above described] premises to conduct a search for identificationC.D.L. and to conduct any related investigation in any related criminal or non-criminal law enforcement matter." The foregoing information was preprinted on the form, except the underlined portion, which was handwritten by Harris on blank lines contained on the form.
[6] Vehicle Code section 10751 provides in pertinent part: "(a) No person shall knowingly buy, sell, offer for sale, receive, or have in his or her possession, any vehicle ... from which any serial or identification number, including, but not limited to, any number used for registration purposes, that is affixed by the manufacturer to the vehicle or component part .. . has been removed, defaced, altered, or destroyed, unless the vehicle or component part has attached thereto an identification number assigned or approved by the department in lieu of the manufacturer's number."

Violation of Vehicle Code section 10751 is a misdemeanor and not an infraction. (Veh. Code, § 40000.9.)
[7] The trial had been bifurcated; the issue of the liability of the individual police officer defendants was tried first; if necessary, the trial would then proceed on the issues of the liability of the County and the City of Vernon under principles set out in Monell v. New York City Dept. of Soc. Serv. (1978) 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611.
[8] Wiles testified that earlier in the day on June 24, Patricia Venegas, the wife of Ricardo Venegas, had been arrested driving a stolen late model Dodge truck; the truck was impounded and officers obtained a search warrant for the home of Ricardo Venegas.
[9] Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
[10] Vehicle Code section 40302 provides in pertinent part: "Whenever any person is arrested for a violation of this code, not declared to be a felony, the arrested person shall be taken without unnecessary delay before a magistrate ... in any of the following cases: [10 (a) When the person arrested fails to present his driver's license or other satisfactory evidence of his identity for examination ..."
[11] While most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in Terry v. Ohio (1968) 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889], some traffic stops are supported by probable cause. (People v. Valenzuela (1999) 74 Cal.App.4th 1202, 1207, fn. 3, 88 Cal.Rptr.2d 707.) "Atwater v. Lago Vista (2001) 532 U.S. 318 [121 S.Ct. 1536, 149 L.Ed.2d 549] (Atwater) ... upheld a custodial arrest for a violation of Texas's seatbelt law, an offense punishable by a fine of not less than $25 nor more than $50. [Citation.] Under Atwater, all that is needed to justify a custodial arrest is a showing of probable cause. `If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.' [Citation.] We must therefore conclude that there is nothing inherently unconstitutional about effecting a custodial arrest for a fine-only offense." (People v. McKay (2002) 27 Cal.4th 601, 607, 117 Cal.Rptr.2d 236, 41 P.3d 59.) For nonfelony offenses under the Vehicle Code, "an officer has broad discretion to effect a custodial arrest under [Vehicle Code] section 40302(a) unless the offender has presented a current and valid driver's license or other reliable documentary evidence of identification." (Id., at p. 622, 117 Cal.Rptr.2d 236, 41 P.3d 59.) Other satisfactory evidence of identityi.e., those forms of documentary evidence that are the functional equivalent of a driver's license, include "a state-issued identification (§ 13005) and other current, reliable documentary evidence of identity that, like a driver's license, bears the person's photograph, physical description, current mailing address, and signature, and is serially or otherwise numbered." (Id., at p. 620, 117 Cal.Rptr.2d 236, 41 P.3d 59.)
[12] (See, e.g., Florida v. Royer (1983) 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 [evidence obtained during unlawful detention is inadmissible even though defendant consented to search during the detention]; see also People v. McGaughran (1979) 25 Cal.3d 577, 591, 159 Cal.Rptr. 191, 601 P.2d 207 [evidence obtained as direct product of exploitation of unlawful detention is tainted and should be suppressed].)
[13] The following discussion applies to the nonsuit on the unlawful search claim as to respondents Wiles, Harris, County, and City of Vernon. Section 1983 liability arises only upon a showing of personal participation by the defendant. (Taylor v. List (9th Cir.1989) 880 F.2d 1040, 1045.) There was insufficient evidence that Gray or Jimenez participated in the search of the Venegas home.

However, the discussion in this section applies to plaintiff Vincent Venegas, the minor son of the other plaintiffs, whose bedroom was searched by the officers. Defendants apparently argued below that because Vincent was not at home at the time of the search, he has no standing to bring a federal civil rights claim based on the alleged unlawful search. In their appellate briefs, respondents fail to address this point, or provide any authority to support this proposition, so we deem the point waived on appeal.
[14] Currently pending before our Supreme Court in People v. Sanders (S092088 (#01-21)) are the following issues: (1) whether the court should reconsider the holding in In re Tyrell J. (1994) 8 Cal.4th 68, 74, 32 Cal. Rptr.2d 33, 876 P.2d 519, that the otherwise illegal search of a minor subject to a probation search condition is not unconstitutional despite the officer's ignorance of the search condition; (2) if the holding of In re Tyrell J. remains viable, whether that holding should apply to adult parolees who are subject to search conditions; and (3) whether under People v. Robles (2000) 23 Cal.4th 789, 97 Cal.Rptr.2d 914, 3 P.3d 311, the admissibility of the fruits of the search differ as to a defendant who is not subject to a search condition as compared to a defendant who was.
[15] Specifically, appellants contend that the court erred in admitting evidence of the officers' opinions, subjective beliefs, and regular practices; the court erred in admitting evidence of Venegas's felony conviction, and the nature of that former conviction; and the court erred in admitting for impeachment purposes the discovery responses of Venegas and Beatriz. By failing to review these issues here, we do not intend to indicate that the trial court's evidentiary rulings were correct. On retrial, appellants will be free to raise the same evidentiary objections and the court on retrial should not assume that the prior rulings on the evidence were correct.
[16] Civil Code section 52.1, subdivision (b), (hereinafter section 52.1(b)), the text of which has not been amended since 1991, provides in pertinent part: "Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages

Subdivision (a) of section 52.1 provides that the interference with the specified legal right must be "by threats, intimidation, or coercion." Thus, "section 52.1 does require an attempted or completed act of interference with a legal right, accompanied by a form of coercion." (Jones v. Kmart Corp. (1998) 17 Cal.4th 329, 334, 70 Cal.Rptr.2d 844, 949 P.2d 941.)
[17] Appellants briefs do not challenge the trial court rulings on Baca's and Sheriff's Department's demurrer to the state law claims in the first amended complaint. We deem appellants to have abandoned the state law claims as to Baca and Sheriff's Department only. We also note that the first amended complaint expressly stated that Baca was being sued in his official capacity only.
[18] A similar published opinion of Bishop Paiute Tribe appears at 291 F.3d 549, with a different analysis of issues which are not pertinent here.